## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| **EXPRESSJET AIRLINES LLC,** | Case No. 22-10787 (___) |
| Debtor.[1] | |

## DECLARATION OF JOHN GREENLEE IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST DAY RELIEF

I, John Greenlee, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I am the President of ExpressJet Airlines LLC ("ExpressJet", the "Debtor", or the "Company"), the debtor in this chapter 11 case.  In my various capacities with ExpressJet and its corporate parent, ManaAir LLC ("ManaAir"), I am or have been responsible for overseeing ExpressJet's operations (flight operations and maintenance), material transactions, finance (including tax, accounting, controls, compliance, and insurance), legal, human resources, and marketing.  I have also served as ExpressJet's interim Chief Executive Officer.  Before joining ExpressJet, I worked in a number of positions at United Airlines, Inc. ("United"), starting in 1997, and serving most recently in January 2019 as United's Managing Director of United Express (working with United's regional airline partners).  Prior to joining United, I held positions at Honeywell and Group Dekko.  I moved directly from my position as Managing Director of United Express at United to become ExpressJet's Chief Financial Officer and Senior Vice President of Planning and Operations Control in February 2019.  From January 2022 to June 2022, I served as

---

[1]      The last four digits of the Debtor's federal EIN are 4495.  The Debtor's mailing address is 1745 Phoenix Boulevard, Suite 250, College Park, GA 30349.

ExpressJet's Interim Chief Executive Officer (serving ManaAir in the same capacity), and since June 2022 I have served as ExpressJet's President (serving ManaAir in the same capacity). I hold a B.A.S. in Mechanical Engineering and Economics from Stanford University, and an M.B.A. in Finance and Operations from Indiana University.

2.        I submit this declaration (the "Declaration") in support of the First Day Motions (as defined below) and to provide information to the Court and parties in interest regarding the Debtor. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtor's management or the Debtor's professionals, discussions with other employees of the Debtor, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial conditions and the industry in which the Debtor operates. If called as a witness, I could and would competently testify to the matters set forth in this Declaration.

3.        Today (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), as well as certain motions and other applications (the "First Day Motions"), with the Court, thereby commencing this chapter 11 case (the "Chapter 11 Case").

4.        In addition to the First Day Motions and the Petition filed today, the Debtor is concurrently filing *Debtor's Motion for Entry of an Order (I) Approving Debtor's Key Employee Retention Plan (II) Granting Administrative Expense Priority Status to All Payments to be Made by the Debtor Pursuant thereto and (III) Granting Related Relief* [DK.   ] (the "KERP Motion"), and *The Debtor's Motion to Shorten the Time for Notice of Debtor's Motion for Entry of an Order (I) Approving Debtor's Key Employee Retention Plan (II) Granting Administrative Expense*

2

*Priority Status to All Payments to be Made by the Debtor Pursuant thereto and (III) Granting Related Relief* [D.I.   ] (the " KERP Notice Motion"), together with *the Declaration of John Greenlee in Support of Debtor's Motion for Entry of (A) an Order (I) Approving Debtor's Key Employee Retention Plan (II) Granting Administrative Expense Priority Status to All Payments to be Made by the Debtor Pursuant Thereto and (III) Granting Related Relief, and (B) Shortening Time for Notice Thereof* [D.I.   ] (the "KERP Declaration"). In the KERP Declaration, I explain that both the KERP Motion and the KERP Notice Motion are critical to the Debtor's ability to provide assurance to those employees it needs to retain—many of whom could find employment across the tarmac from their current place of employment with the Debtor. Moreover, the Debtor must be able to provide further assurance to these employees that they will receive retention compensation within the short timeframe they are expected to continue in the Debtor's employ. Unless the time for notice of the Motion can be shortened to accommodate the short-term nature of the Debtor's post-petition employment of certain of these individuals, the Debtor will not be able to obtain the relief it needs in time to retain and compensate these highly marketable employees.

5.      The Debtor historically was engaged in business as a "regional air carrier," providing flight services on behalf of other airlines under private label capacity purchase agreements using aircraft subleased from United.  United and ExpressJet entered into an Amended and Restated Capacity Purchase Agreement dated January 22, 2019 (the "CPA"), which set forth terms and conditions related to ExpressJet's exclusive provision of regional flight services to United through December 2022.

6.      On July 30, 2020, United informed ExpressJet of United's intent to withdraw all aircraft from the CPA, eliminating all ExpressJet's revenues.  ExpressJet worked with

United following receipt of this information to achieve an orderly return of all aircraft and related parts to United or United's aircraft lessors.  ExpressJet ceased revenue flight operations as of September 30, 2020, and its certificated authority to fly, granted by the U.S. Department of Transportation (DOT), became dormant after 30 days.

7.      In the spring of 2021, ExpressJet reapplied to DOT for certificated authority to fly and thereafter regained such authority in late summer of 2021.  ExpressJet then resumed commercial operations on October 24, 2021, as both an *ad-hoc* air charter provider and scheduled commercial airline under its own leisure brand aha!—short for "Air-Hotel-Adventure"—centered at the Reno-Tahoe International Airport and flying to small West Coast airports.

8.      As described in more detail below, shortly before the Petition Date, the Debtor ceased all operations, including air charter and scheduled flight services, laid off a majority of its employees, and is in the process of returning its aircraft to lessors.  The Debtor's principal objective in this Chapter 11 Case is to conduct an orderly liquidation of its remaining assets, which include valuable new and used commercial aircraft parts (the "Physical Assets").  The Debtor intends to engage in an auction process to sell these Physical Assets, and will liquidate according to a chapter 11 plan of liquidation.  Additionally, the Debtor possesses a list of approximately 1,300 furloughed pilots, (the "Furlough List") and its FAA-issued operating certificate (the "Certificate") as explained below, that it also intends to offer for sale.  The Debtor has engaged in a robust marketing process in order to generate interest among potential plan sponsors and lenders. That process has not been successful to date, and therefore the primary objective of this case is to liquidate the Physical Assets and then pursue a plan of liquidation.

9.      The Debtor's bankruptcy case is largely a result of the three major issues that negatively impacted the Debtor's business, revenues, financial condition, and results of

operations since the resumption of flying in October 2021: (i) the difficulty in scaling operations to spread overhead costs over revenues earned; (ii) lower revenue projections as a result of depressed travel demand during periods of new COVID-19 variants; and (iii) inflationary pressures, including cost escalations in fuel.

10.     I have reviewed each of the First Day Motions (including the exhibits and other attachments to such pleadings), and I believe that the facts set forth in each are true and correct to the best of my knowledge and information.  The relief sought in the First Day Motions is necessary to the Debtor's efforts to facilitate an orderly liquidation of the Debtor's assets and wind down of its affairs so as to preserve and maximize the value of the Debtor's assets for the benefit of the Debtor's estate and creditors.  The First Day Motions are intended to enable the Debtor to preserve and position for sale its salable assets, and to minimize adverse consequences that might otherwise result from the commencement of this Chapter 11 Case.

11.     Part I of this Declaration provides a brief overview of ExpressJet's prepetition business and the circumstances that prompted the commencement of this Chapter 11 Case.  Part II provides an overview of the Debtor's significant assets and liabilities.  Part III addresses the Debtor's strategy to maximize the value of its assets through chapter 11.  Finally, Part IV affirms the facts that support the relief requested in the First Day Motions. The relief requested in the First Day Motions is narrowly tailored to the Debtor's urgent needs and is necessary to avoid immediate and irreparable harm.

I.     **Overview of ExpressJet's Business Prior to the Petition Date**

12.     ExpressJet is a Delaware limited liability company, after having converted in April 2019 from a Utah corporation, ExpressJet Airlines, Inc.  An organization chart showing ExpressJet's current ownership is attached hereto as **Exhibit A**.

13.     The original ExpressJet company was established in 1986 as a result of the acquisition by Texas Air Corporation / Continental Airlines of several small commuter airlines, including Bar Harbor Airlines in Maine, Provincetown-Boston Airlines in New England, Rocky Mountain Airways in Denver, Colorado, and Britt Airways in Terre Haute, Indiana.

14.     ExpressJet then operated for approximately 20 years as a regional air carrier that contracted with Continental, JetBlue, American, and United.

15.     After the United and Continental Airlines merger in 2010, ExpressJet signed a multiple-year contract with United to operate ERJ145 aircraft for United.

**A.  Purchase by SkyWest**

16.     On November 12, 2010, ExpressJet was purchased by SkyWest, Inc. (the parent company of SkyWest Airlines), and merged with Atlantic Southeast Airlines ("ASA"), a former Delta Air Lines ("Delta") subsidiary providing private label regional air services for Delta. In October 2011, the combined entity adopted the name ExpressJet.

17.      ExpressJet continues to hold a Federal Aviation Administration Part 121 Air Carrier Certification (previously defined as the "Certificate"), which allows ExpressJet to operate as an airline providing air services to the public using larger commercial aircraft.

**B.  Purchase by ManaAir and United Airlines' Investment**

18.     In December 2018, ManaAir entered into an agreement to buy ExpressJet from SkyWest.  At that time, KAir Enterprises LLC was the majority (50.1%) owner of ManaAir and United Airlines was the minority (49.9%) owner.

19.     The acquisition by ManaAir was finalized in January 2019 and included more than 100 ERJ145 aircraft subleased from United, 16 CRJ200 aircraft subleased from

SkyWest, and a commitment by United to sublease 25 new E175 aircraft.  All these aircraft were to be flown under the CPA private label United Express operation.

20.    In February 2020 United Airlines announced a formal reassignment of an additional 36 ERJ145 jets from another United Express carrier to ExpressJet—making ExpressJet the largest operator of ERJ145 aircraft in the world.  As part of this same reassignment, United also informed ExpressJet that the 25 E175 aircraft would be moved to a different United Express operator.

### C.   Termination of Flying under the United CPA

21.    In the spring of 2020, United communicated to ExpressJet that it would be reducing its 50-seat operations under United Express and that ExpressJet could see substantial reductions in flying under the United CPA.

22.    On July 30, 2020, United Airlines announced that it would terminate all revenue flying operations from ExpressJet, and because 100% of the aircraft operated by ExpressJet were leased from United, the aircraft were to be either moved into storage, returned to the head lessor, or transitioned to another United Express operator.

23.    Consequently, ExpressJet ceased United Express flying operations on September 30, 2020.

24.    To wind down its operations, ExpressJet returned all the aircraft and associated parts to United and closed all of its operations, maintenance, and training maintenance bases, including those in Chicago, Cleveland, Richmond, Newark, Knoxville, and Houston.

25.    Thirty (30) days after its last scheduled service flight, ExpressJet's authority to offer commercial air services became "dormant."  Upon dormancy, reinstatement of that

authority requires an application for reinstatement with the U.S. Department of Transportation ("<u>DOT</u>") to resume commercial air service.

### D.  Resumption of Operations and Launch of aha! Brand

26.     ExpressJet began the application process to reinstate its authority in early 2021.  In July 2021, DOT granted final approval for ExpressJet to restart commercial operations.

27.     On October 1, 2021, ExpressJet began the operation of its business segment named "aha!".  aha! provides scheduled air service between Reno-Tahoe International Airport and cities along the West Coast of the United States. Scheduled flights began on October 24, 2021. aha! focuses on cities, markets, and customers that have seen diminished air service as a result of airline industry consolidation.

### E.  Divestiture by United

28.     United Airlines Holdings Inc. divested its stake in ManaAir in May 2022, and, as a result, ExpressJet became 100% indirectly owned by KAir Enterprises LLC and MNBS Associates LLC (as the two members of ManaAir), and remained directly wholly owned by ManaAir.

### F.  ExpressJet's Recent Financial Performance and Operations

29.     Because ExpressJet did not operate from September 2020 until the end of October 2021 when it restarted revenue operations, its 2021 gross operating revenue was $926,781.74, amounting to less than 0.5% of its $190,733,169.55 in 2020 operating revenues generated by operations under the United CPA.

30.     Also, non-operating revenue decreased from $110,871,955.28 in 2020 to $17,141,258.17 in 2021.  The bulk of 2020 non-operating revenue was funding obtained under the CARES Act.

31.     In 2022, until its prepetition cessation of operations, ExpressJet had four (4) ERJ145 aircraft in operation.  These aircraft flew scheduled commercial operations (as aha!) and *ad hoc* charter service.

32.     In 2022, through July 2022, ExpressJet's estimated gross revenues totaled $5.5MM and estimated gross expenses totaled $23.3MM – generating an operating loss of $17.7MM.

33.     Because ExpressJet was losing money and did not have a clear path to return to profitability, ExpressJet ceased commercial and charter air operations on August 22, 2022, in order to conserve resources for its Chapter 11 Case and for the benefit of creditors.  Though ExpressJet has ceased commercial operations and intends to liquidate, preserving the value of its remaining assets requires maintaining use of utilities, bank accounts, and vendor services, and retaining certain employees, as necessary, during the postpetition period.

## II.  The Debtor's Significant Assets and Liabilities

34.     A summary of the Debtor's capital structure, excluding goodwill and shareholder equity, is below.  None of the Debtor's debt is secured.

### A.  The Debtor's Assets Today

35.     The Debtor's assets are unencumbered and consist of:

a.  cash and other liquid assets;

b.  Parts, consisting of (i) new and used aircraft parts and tooling for use on Embraer E175 aircraft, (ii) new and used aircraft parts, tooling, and ground equipment for use on Embraer ERJ145 aircraft (previously defined herein as "Physical Assets");

c.  General office equipment and supplies; and

    d.  Certain prepaid expenses and deposits, including pre-paid tickets and charter deposits and maintenance reserves under aircraft lease agreements.

36.    The Debtor also possesses the Certificate and certain intangible property related to that Certificate, such as information systems, operational manuals and Collective Bargaining Agreements.  The Certificate provides authorization to provide large aircraft commercial air services to the public.  While the Debtor no longer intends to operate, and the Certificate is personal to the Debtor, it is possible that a purchaser through a plan of liquidation or otherwise could step into the Debtor's shoes under the Certification, subject to DOT and FAA approvals in an abbreviated approval process (similar to those the Debtor obtained in July 2021).  Thus, the Certificate may have value to a purchaser because it otherwise typically takes more than a year and several million dollars to go through the process of achieving such a certificate.

37.    The Debtor also is party to Collective Bargaining Agreements ("CBA") for several of its workgroups, including with the Air Line Pilots Association ("ALPA") in regard to the CBA applicable to the Debtor's pilots.  A key feature of the pilot CBA is the Furlough List.  Pilots on the Furlough List can be recalled to fly again with reduced training.  Given the ongoing pilot shortage in the commercial aviation industry, the Debtor is hopeful that one or more parties may be interested in acquiring the Furlough List through a plan of liquidation or otherwise.

B. **The Debtor's Outstanding Debt[2]**

38.    The Debtor's outstanding debt falls into two (2) categories: Incurred and Due in the Current Year 2022 ("<u>Current Debt</u>") and Incurred and Due in Previous Years ("<u>Legacy Debt</u>").

39.    The Debtor's Current Debt is $2.4MM consisting of $0.9 million of unearned revenue and $1.5 million of outstanding payables. The Debtor's Legacy Debt is $24.1MM.

40.    The Debtor's Legacy Debt totals are set forth in these categories:

   a.  $5.1MM of accrued executive incentive payments;

   b.  $2.6MM in outstanding payables;

   c.  Approximately $2.5MM in ascribed liabilities related to continued workers' compensation claims;

   d.  $3.9MM as the 10-year loan portion of the $113MM received in 2020 under the CARES Act; and

   e.  $10MM as the 5-year loan received in 2020 under the Paycheck Protection Program.

III.   **Events Leading to the Commencement of the Chapter 11 Case**

41.    ExpressJet's business plan was predicated on, among other parameters, being able to: (i) grow sufficiently to be able to spread overhead costs across a growing fleet and achieve competitive unit costs; (ii) generate sufficient revenues, particularly through commissions

---

[2]    These amounts are accurate as of July 31, 2022, and will be updated as part of the Debtor's monthly reconciliation process at the end of August 2022.  I will supplement this Declaration to include those updated amounts when available.

and incremental revenues from bundling hotel and air travel offerings; and (iii) maintain costs at business-plan levels.

42.     ExpressJet was not able to achieve the above three objectives at business plan expectations and, consequently, the gap between ExpressJet's operating revenues and operating expenses increased precipitously and became an unacceptable drain on its assets. Specific negative impacts on ExpressJet's business plan resulted from:

a.   Stunted Growth:  ExpressJet's plan called for growth of approximately one (1) aircraft per month and achieving approximately eight (8) aircraft by mid-2022.  ExpressJet targeted this size and the associated revenue so that overhead expenses would be spread sufficiently across the revenue base, which would enable ExpressJet to break even on an operating basis.   Unfortunately, the market for ERJ145 aircraft tightened significantly, precluding ExpressJet from procuring the required aircraft at a manageable cost.

b.   Revenue Shortfall:  ExpressJet also experienced a revenue shortfall. Two factors drove this shortfall: (i) the COVID-19 resurgence in early 2022, which significantly lowered demand during the early months of 2022, and (ii) the reliance of ExpressJet's business plan on its ability to generate a double-digit percentage of revenues and an even higher proportion of profits from bundling airfare with hotel accommodations and other activities.  Unfortunately, ExpressJet has been unable to develop the technology to provide a convenient bundling program to capture revenues.

12

      c.  Fuel and other Cost Creep:  The 50–100% increase in fuel costs and the other inflationary pressures have driven higher costs at ExpressJet.  As a startup airline, with low brand acceptance and customer loyalty, ExpressJet has been unable to pass along those cost increases to passengers in the form of higher fares.

43.    The result of the growing revenue-cost gap drove ExpressJet to seek capital to (i) rectify its weakening balance sheet and (ii) provide additional funds to take structural steps such as replacement of its aircraft with lower cost alternatives.

44.    ExpressJet engaged financial advisor Raymond James Associates ("Raymond James") to market ExpressJet and its assets to interested third-party investors. Raymond James commenced a marketing process in June 2022, which involved outreach to 350 parties, including 193 strategic and financial buyers and 157 lenders.  The initial outreach generated significant interest in ExpressJet, resulting in parties expressing interest in acting either as a provider of debtor-in-possession financing, a plan sponsor, or a combination of the two. During the marketing process, 45 parties executed non-disclosure agreements, and extensive calls were held between Raymond James, the Debtor's executives, and multiple other parties to discuss the opportunity.

45.    One indication of interest was submitted by a single party in mid-July 2022 for both the financing and purchase of ExpressJet, contingent on the party obtaining financing that has yet to materialize.  Despite numerous discussions with other third parties—some of which remain ongoing as of the filing of this Chapter 11 Case—none of the remaining parties that conducted diligence regarding the opportunity offered by ExpressJet have formally indicated their interest in a transaction.  Since receiving the single indication of interest, Raymond James has held

numerous calls with that one party and its investment banker to facilitate their diligence and efforts to raise the capital needed to fund an acquisition.  But the discussions to date with this party have led ExpressJet and its professional advisors to conclude that this interested party lacks the capital needed to provide financing to the Debtor or to consummate a plan or acquisition.

46.     During the week of August 15, 2022, Raymond James communicated that while it would continue discussions with the parties showing interest, it had significantly diminished confidence that it would be able to conclude a financing transaction within a time that would allow sufficient funds to come into ExpressJet for it to pursue its business plan as a going concern.

47.     Therefore, after considering all available strategic options, ExpressJet, in consultation with its professional advisors, determined that the best course to preserve and maximize the value of the Debtor's enterprises is through a liquidation in chapter 11 as more fully described in section IV below.

48.     Accordingly, the Debtor has shut down its operations to conserve cash, and has laid off 71 employees, which leaves the Debtor with only those employees that it considers to be essential to its chapter 11 liquidation efforts.  The Debtor's cash needs are considerably reduced as a result of this shut down of operations, and, at the same time, the Debtor will be able to preserve its valuable assets.  The Debtor anticipates its monthly cash needs to be $1MM in chapter 11. Had the Debtor not ceased operations, the Debtor anticipates that it would have required approximately $2.5MM monthly to fund operations.  Therefore, the Debtor has taken the steps needed to prosecute this Chapter 11 Case, and to best mitigate the financial difficulties described herein so that the Debtor can use the relief afforded by chapter 11 to the best advantage of its estate.

49.     The Debtor continues to maintain discussions with parties who had previously expressed interest in the process initiated by Raymond James.   Many of these parties have positions and interests in the airline, travel, aerospace, and aircraft parts businesses.   Further, many of them are known to the Debtor and vice versa.   The Debtor believes that continuing the communication may prove to be beneficial to the Debtor's estate following the chapter 11 petition.

IV.     **The Chapter 11 Case**

50.     Due to the financial difficulties explained above, the Debtor, in consultation with its professional advisors, has diligently evaluated a range of strategic alternatives to address its liquidity challenges.   After a careful assessment, the Debtor and its professional advisors have determined that the best course of action to further the Debtor's value maximizing efforts is to market and sell its Physical Assets.

51.     Should a third-party investor want to acquire rights to the Debtor's Certificate and associated intangible property, the Debtor would pursue a potential sale of the residual entity associated with that asset.   Should that effort fail, the Debtor will simply liquidate its Physical Assets and confirm a liquidating plan.

52.     Liquidation in chapter 11 is particularly appropriate here because the Debtor has many decades of technical expertise in purchasing and selling aircraft equipment and therefore has the expertise to execute the auction process and manage the highly technical job of cataloging and selling the Physical Assets.   To be clear, a very valuable aircraft part becomes scrap aluminum if improperly warehoused and if records and maintenance information are not retained in a manner acceptable to a buyer and the FAA.   Moreover, the Debtor's key executives have many decades of experience in the industry and will be able to effectively market the Certificate and associated intangible property for the benefit of its creditors.

15

53.     In contrast, the Debtor believes that liquidation in a chapter 7 case would be value destructive and detrimental to its creditors and the estate, including because (i) it is the Debtor's understanding that the Certificate is immediately extinguished upon such a filing, thereby destroying any prospect of realizing value from the Certificate, and (ii) any delay in appropriate management and maintenance of aircraft parts risks quickly losing their value as a result of non-maintenance of temperature and humidity in the facilities in which the Physical Assets are stored and the loss of required records updates by qualified personnel familiar with the unique requirements of maintaining such parts and records.

54.     To achieve a value-maximizing sale, the chapter 11 process envisioned by the Debtor includes continuation of certain prepetition functions for a short time to facilitate the orderly wind down of the Debtor's business, the securing of Physical Assets, and the retention of certain key employees and service providers to facilitate the foregoing, as well as continuation of bank accounts, utilities and insurance.  This will allow the Debtor to:

> a.  Continue to warehouse the Physical Assets in temperature and climate-controlled facilities, to protect the Physical Assets from degrading and becoming worthless to a potential purchaser, and
>
> b.  Maintain detailed records with respect to the Physical Assets as required by the FAA; any aircraft part without such current records is worthless or requires costly testing and remediation.

Therefore, the Debtor requires certain relief, described below, to complete the wind down of its operations, as well as relief necessary to successfully liquidate the Physical Assets under chapter 11 of the Bankruptcy Code.

## IV.    <u>The First Day Motions</u>

55.    Concurrently herewith, the Debtor has filed the First Day Motions seeking relief related to the administration of the Chapter 11 Case, the Debtor's orderly wind down, and cash management needs, to ensure a smooth entry into chapter 11.  I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe that the relief sought in each First Day Motion: (i) will enable the Debtor to carry out its wind down and liquidation functions in chapter 11 with minimal disruptions; (ii) is critical to the Debtor's chapter 11 efforts; (iii) best serves the interests of the Debtor's estate and creditors; and (iv) is necessary to avoid immediate and irreparable harm for the reasons described therein. Further, it is my belief that the relief sought in the First Day Motions is in each case narrowly tailored and necessary to achieve the goals identified above.  A list of the First Day motions is set forth below:

a.    *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Maintain Employee Compensation Practices and Benefits Programs and (B) Redact Certain Personally Identifiable Information of Debtor's Current and Former Employees, and (II) Granting Related Relief*;

b.    *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto, and (III) Granting Related Relief*;

c. *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Prepetition Claims of Certain Critical Vendors, and (II) Granting Related Relief;*

d. *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Continue its Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related thereto (C) Maintain its Bank Accounts and Existing Business Forms, (D) Implement Changes to the Existing Cash Management System as Necessary, and (E) Continue Ordinary Course Intercompany Transactions, (II) Waiving the Requirements of 11 U.S.C. § 345(b) and the U.S. Trustee's Operating Guidelines, and (III) Granting Related Relief;*

e. *Debtor's Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Provides from Altering, Refusing or Discontinuing Utility Services, (II) Approving Proposed Adequate Assurance of Payment to Utility Providers and Authorizing Debtor to Provide Additional Assurance, (III) Establishing Procedures to Resolve Requests for Additional Assurance and (IV) Granting Related Relief.*

56.    The First Day Motions seek authority to, among other things, honor work-force related compensation and benefit obligations, pay certain prepetition claims, continue the Debtor's bank accounts during the Chapter 11 Case and continue other necessary functions in winding down operations, which the Debtor anticipates to be complete within ten (10) days from this date.  The Debtor has narrowly tailored the First Day Motions to meet the goals of: (i) continuing its wind down efforts in chapter 11 with as little disruption as possible until all

18

employees can be returned to their home base and leased equipment can be returned to the relevant lessor, (ii) preserving the value of the Physical Assets and selling those assets through an orderly and effective auction sale process, and (iii) establishing procedures for the efficient administration of the Chapter 11 Case.

57.     I have reviewed each of the First Day Motions (including the exhibits thereto), and I believe the facts stated therein to be true and correct to the best of my knowledge, with appropriate reliance on corporate officers, business records, and advisors.

58.     It is my belief that the relief sought in the First Day Motions is necessary to (a) ensure the success of the Debtor's chapter 11 efforts, (b) avoid immediate and irreparable harm, and (c) maximize the value of the Debtor's estate.  It is further my belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims, the relief requested is essential to the Debtor's chapter 11 efforts and necessary to avoid immediate and irreparable harm to the Debtor's estate.  The success of the chapter 11 liquidation plan depends upon the Debtor's ability to maintain key functions in the very-near term postpetition and maximize estate value. The relief requested in the First Day Motions is a critical component of the orderly chapter 11 liquidation strategy envisioned by the Debtor.

## CONCLUSION

59.     In conclusion, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief, as set forth in this Declaration, the foregoing is true and correct.

Executed: August 23, 2022                    */s/ John Greenlee*                    
                                             John Greenlee
                                             President
                                             ExpressJet Airlines LLC