## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>**EXPRESSJET AIRLINES LLC,**<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 22-10787 (MFW)<br><br>**Proposed Hearing Date:**<br>August 26, 2022 at __ (ET)<br><br>**Proposed Objection Deadline:**<br>At or before the hearing |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING DEBTOR'S KEY EMPLOYEE RETENTION PROGRAM, (II) GRANTING ADMINISTRATIVE EXPENSE PRIORITY STATUS TO ALL PAYMENTS TO BE MADE BY THE DEBTOR PURSUANT THERETO AND (III) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "Debtor"), by and through its undersigned proposed counsel, respectfully moves (the "Motion") as follows:

### RELIEF REQUESTED

1. The Debtor seeks entry of interim and final orders, substantially in the form attached hereto as **Exhibit A** (the "Proposed Interim Order") and **Exhibit B** (the "Proposed Final Order" and, together with the Proposed Interim Order, the "Proposed Orders"), (i) approving the Key Employee Retention Program ("KERP") *nunc pro tunc* to the Petition Date, *provided, however,* that the aggregate amounts paid under the KERP will not exceed $12,000 per day through August 31, 2022, and then will not exceed $5,500 per day through the later of (a) entry of a final order approving the Motion or (b) 21 days following the Petition Date; *provided further*

---

[1] The last four digits of the Debtor's federal EIN are 4495. The Debtor's mailing address is 1745 Phoenix Boulevard, Suite 250, College Park, GA 30349.

*that* the total cost of the KERP will not exceed $450,000 on a final basis[2]; (ii) granting administrative expense priority status to all payments made by the Debtor pursuant to the KERP; and (iii) granting related relief. In support of this Motion, the Debtor represents as follows:

## I.     PRELIMINARY STATEMENT

2. The Debtor is working to consummate a sale of certain of its assets and intends to liquidate pursuant to a chapter 11 plan of liquidation. However, without certain assurances, its non-insider employees essential for a successful wind down will simply walk across the airport tarmac to seek other employment, particularly in an airline industry where the demand for labor is exceedingly high. In fact, as of today, employees have already walked off the job.

3. Facing this reality, the Debtor and its professionals analyzed what steps could be taken to ensure that the KERP Participants would be willing to remain employed by the Debtor rather than seeking alternative employment. Based on this analysis, the Debtor carefully formulated the KERP herein to provide additional compensation to ensure retention of its key employees as opposed to pursuing the far more cost prohibitive route of hiring third party contractors.

4. Most critically, the Debtor's Physical Assets (as defined in the First Day Declaration), including a large inventory of valuable aircraft parts, must be maintained by mechanics on site in their warehouse locations, under strict conditions set forth in FAA regulations. If those mechanics walk off the job, those very valuable parts will be rendered worthless as no buyer will want assets that are not properly maintained. In order to maximize the value of the estate for the benefit of *all* the Debtor's creditors and fulfill the Debtor's

---

2    This estimated maximum KERP program cost assumes that no KERP beneficiaries leave before the debtor asks them to. As such, this estimate certainly overstates the actual cost.

obligations with respect to maximizing the value of its remaining assets through sales, it is critical that core staff of the Debtor's employees remain in place.

## II. JURISDICTION

5. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue of this case and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6. The Debtor consents pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7. The statutory bases for the relief requested herein are sections 363, 503, 507(a)(2), 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"), as supplemented by rule 6004 of the Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 9013-1(m).

## BACKGROUND

**I.  General Background**

8. On August 23, 2022, (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. The Debtor continues to manage its assets as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee has been appointed in this case.

9. Prior to filing for bankruptcy, the Debtor operated as a regional airline company with more than 40 years of experience. In particular, the Debtor operated its leisure brand aha! (short for "air ● hotel ● adventure"), which provided travelers in smaller communities with convenient, short, nonstop flights to and from the Reno-Tahoe International Airport. The Debtor also operated *ad hoc* charter flights. As of the Petition Date, the Debtor has ceased operating, canceled its scheduled and charter flights, terminated a substantial number of employees, and intends to promptly return its leased aircraft and liquidate its remaining assets.

10. Additional detail regarding the Debtor and its business, and the facts and circumstances supporting the relief requested herein is set forth in the *Declaration of John Greenlee in Support of Debtor's Motions for Entry of (A) Interim and Final Orders (I) Approving Debtor's Key Employee Retention Plan (II) Granting Administrative Expense Priority Status to All Payments to be Made by the Debtor Pursuant Thereto, and (III) Granting Related Relief, and (B) to Shorten Time for Notice Thereof* [D.I. No. ● ] (the "KERP Declaration") filed concurrently with this Motion and incorporated herein by reference.

## II.    The KERP Participants

11. As set forth in the KERP Declaration filed concurrently herewith, the KERP Participants consist of approximately thirty-five employees of the Debtor who are essential to supervising and administering the orderly wind down of operations of the Debtor and preserving the value of the Debtor's estate for the benefit of its creditors. The KERP Participants work across a variety of departments, but generally fall into the following categories: (a) accounting; (b) operations; (c) human resources; (d) information technology; (e) mechanical services; and (f) pilots. Each KERP Participant possesses institutional knowledge and skills that are essential to the Debtor's wind down efforts. The loss of the KERP Participants at this time would severely jeopardize the Debtor's ability to orderly and efficiently wind down its operations, and could

negatively impact recovery to creditors by risking loss of the value of the Debtor's remaining marketable assets, which the Debtor intends to sell for the benefit of its creditors.

12. As explained more fully below and in the KERP Declaration, no KERP Participant is an "insider" under section 503(c) of the Bankruptcy Code. Each KERP Participant reports to a more senior manager and must obtain approval from an appropriate senior manager before taking any significant action with respect to the Debtor's corporate policies or the disposition of significant assets.

### III. The Proposed Terms of the KERP

13. The Debtor designed the KERP to incentivize valuable, non-senior management personnel to remain employed with the Debtor during the chapter 11 case, and to avoid the costs and disruption associated with attrition and turnover.[3] The Debtor carefully and diligently crafted the KERP in close consultation with its advisors. In doing so, the Debtor identified the KERP Participants as approximately thirty-five key, non-insider employees whose continued employment is crucial to the Debtor's ability to wind down in an organized manner and preserve its assets during the period of uncertainty associated with the Debtor's liquidation.

14. The goal of the KERP is to reduce the risk of losing key employees necessary to complete the work required for the wind down of the Debtor's operations. To do this, a higher percentage of retention compensation is allocated to those KERP Participants whose employment is essential to the more tactical and imperative tasks that must be accomplished. The KERP aims to (a) retain employees for 1-4 weeks to ensure an orderly wind down with the maximum extraction and preservation of company assets, and (b) retain a small group of

---

[3] The Debtor saw the need to retain the KERP Participants as particularly significant given the Debtor's expressly stated intention to liquidate, and all of the KERP Participants' positions will ultimately be eliminated during the course of this chapter 11 case.

employees following the initial 1-4 week period to assist in the preservation and sale of valuable aircraft parts and for other tasks related to the administration of this chapter 11 case.

15. Given these goals, the KERP program has been designed to provide the highest KERP compensation amounts to employees who are the most critical to the estate and who are most likely to leave the Debtor's employ for other employment absent such compensation. The KERP Declaration explains in detail how the KERP has been designed specifically to meet the Debtor's needs and requirements for wind down and liquidation.

16. Under the terms of the KERP, each KERP Participant will be entitled to his or her full compensation plus an additional payment equal to the percentage of monthly base compensation indicated in the chart attached as Exhibit A to the KERP Declaration for each month the KERP Participant remains employed by the Debtor (and pro-rated to the portion of a month that such KERP Participant remains so employed), provided that the KERP Participant remains with the Debtor through his/her scheduled termination date, as determined by the Debtor. In the unlikely event that no employee leaves before the Debtor asks them to leave under the KERP, the overall cost to the estate would be $450,000, which certainly overestimates that actual cost of the program.

## BASIS FOR RELIEF

**I.    The Court Should Authorize the KERP.**

17. The Debtor's decision to adopt the KERP reflects a sound exercise of its business judgment, and the program should be approved pursuant to sections 363 and/or 503(c)(3) of the Bankruptcy Code. Sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code are inapplicable to the KERP because the KERP provides for ordinary course payments, and even if it did not, none of the KERP Participants are "insiders" (as defined in section 101(31) of the Bankruptcy Code). As a result, authorization of the KERP is appropriate under the Bankruptcy Code.

> **A.** **Authorization of the KERP is justified under sections 363(b) and 503(c) of the Bankruptcy Code based upon the Debtor's valid exercise of business judgment.**

18. Authorization of the KERP is justified as a valid exercise of the Debtor's business judgment under sections 363(b) and 503(c)(3) of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. §§ 363(b), 1107(a), 1108. Under section 363(b), courts only require that a debtor "show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions . . . [under the] 'business judgment test.'") (citations omitted); *In re Ionosphere Clubs*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). Once a debtor has articulated a valid business justification, there "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

19. "Compensation issues are normally governed by the business judgment standard, i.e., proof that there is a broad business purpose for an action." *In re Global Home Prods., LLC*, 369 B.R. 778, 783–84 (Bankr. D. Del. 2007) (citations omitted). And in particular, "[t]he reasonable use of incentives and performance bonuses are considered the proper exercise of a

7

debtor's business judgment." *Id.* at 784; *see also Montgomery Ward*, 242 B.R. at 153 (affirming bankruptcy court approval of employee incentive program where there existed a "sound business purpose" for doing so).

20. Section 503(c)(3) of the Bankruptcy Code also allows payments to a debtor's employees outside the ordinary course of business if such payments are "justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Although the Third Circuit has not addressed whether this standard differs from the business judgment rule, courts in this Circuit and elsewhere have applied the business judgment rule in determining whether the section 503(c)(3) standard is satisfied. *See, e.g.*, *In re LCI Holding Co.*, No. 12-13319, 2013 WL 1101111, at *1–2 (Bankr. D. Del. Mar. 15, 2013) (holding that debtors' performance-based incentive plans adopted for certain eligible employees satisfied the requirements of section 503(c)(3) and represented a valid exercise of the debtors' business judgment); *Global Home Prods.*, 369 B.R. at 787 (authorizing incentive-based plans under section 363 and without conducting a separate analysis under section 503(c)(3)); *In re Nobex Corp.*, No. 05-20050, 2006 WL 4063024, at *3 (Bankr. D. Del. Jan. 19, 2006) (finding that debtors satisfied burden under sections 363(b) and 503(c)(3)); *In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b).") (citations omitted); *In re Borders Group, Inc.*, 453 B.R. 459, 473–74 (Bankr. S.D.N.Y. 2011) (same).

21. Here, the business justification supporting the KERP is clear. The Debtor requires these key, non-insider employees' specific knowledge and skill sets to maintain certain functions during the Debtor's wind down so that the value of its assets can be maximized through the consummation of the sale of its assets and the ongoing liquidation. The KERP Participants are

highly skilled in their particular fields and are intimately familiar with the Debtor's requirements at this juncture in the Debtor's progression toward liquidation. These KERP Participants have skills that are unique and difficult to replace and that also make many of them highly marketable to other employers. The Debtor also recognizes that its ability to retain the services of the KERP Participants is jeopardized by the very nature of the wind down of its business, which eliminates the long-term prospect of employment for the KERP Participants. The success of the wind down process and this chapter 11 case will depend in large part on the skills and institutional knowledge of each KERP Participant and his or her willingness to work with the same level of diligence as performed prepetition, notwithstanding that (a) the vast majority of the Debtor's employees will be or have been terminated as the closings of the operations and locations conclude and (b) the KERP Participants' own employment with the Debtor will be terminated once the liquidation process concludes. Due to the reduction in the Debtor's workforce, the Debtor's KERP Participants have been, and will be, called upon to take on significant responsibilities in addition to their normal day-to-day functions in order to effectuate a successful wind down. Absent the relief requested herein, the KERP Participants would likely, and understandably, begin to search for alternative employment opportunities promising long-term stability. Such an outcome would be devastating to the Debtor, which would be placed in the difficult situation of trying to attract replacements with only the promise of short-term employment.

22. Further, the Debtor believes that the benefits of the KERP to the estate far outweigh its costs. The overall cost of the KERP, approximately $450,000,[4] is reasonable in light of the

---

4    This estimated maximum KERP program cost assumes that no KERP beneficiaries leave before the debtor asks them to. As such, this estimate certainly overstates the actual cost.

size of the Debtor's estate, the value of the assets to be preserved for sale, the high degree of loss of that value if the KERP Participants ceased to be in the Debtor's employ, and the costs and foregone benefits that would be associated with the loss of this particular workforce. Further, the Debtor is only seeking access to a portion of this pool of funds on an interim basis, subject to a final hearing.

23. Finally, the Debtor further believes that the KERP will improve overall employee morale and incentivize employees to remain with the Debtor. The adoption of the KERP will assure each KERP Participant that his or her efforts during the wind down process are valued by the Debtor and will be rewarded accordingly. Moreover, approval of the KERP will provide the KERP Participants with a greater sense of financial security, thereby eliminating a potential distraction that could adversely affect performance. As a result, the KERP will help to ensure that the KERP Participants remain dedicated and committed to the success of the wind down process.

**B.      Sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to the KERP.**

24. The KERP is not governed by sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code. Section 503(c)(1) of the Bankruptcy Code tightly restricts payments to "insider[s]" to the extent that such payments are made "for the purpose of inducing such person to remain with the debtor's business." 11 U.S.C. § 503(c)(1). Section 503(c)(2) of the Bankruptcy Code tightly restricts "severance payment[s]" to "insider[s]" of the Debtor. 11 U.S.C. § 503(c)(2). As a result, sections 503(c)(1) and 503(c)(2) only apply to retention agreements or severance agreements entered into between debtors and *insiders*.

25. Sections 503(c)(1) and 503(c)(2) do not apply to the KERP because none of the KERP Participants are insiders.[5] Therefore, the restrictions on retention payments contained in section 503(c)(1) are inapplicable.[6] Section 101(31)(B) of the Bankruptcy Code defines an "insider" to include any "director," "officer," or "person in control" of a debtor. 11 U.S.C. § 101(31). Because section 101(31) is defined to "include" those enumerated categories, there are also "non-statutory insiders" that fall within the definition of insider, but outside of the Bankruptcy Code's enumerated categories. *In re Foothills Tex., Inc.*, 408 B.R. 573, 578 (Bankr. D. Del. 2009) (citing *Schubert v. Lucent Techs. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 395–96 (3d Cir. 2009)). An individual is a non-statutory insider where there is "anything other than closeness to suggest any transactions were not conducted at arm's length." *Id.* at 578–79 (citing *Winstar*, 554 F.3d at 596).

26. None of the KERP Participants are statutory insiders or non-statutory insiders. This remains true even though certain of the KERP Participants have the term "officer" in their titles. *See Foothills Tex.*, 408 B.R. at 574–75 (holding that any person holding an officer's title is presumptively an officer and that "a party seeking to rebut that presumption must present evidence sufficient to establish that the person holds the title of an officer in name only and, in fact, does not meet the substantive definition of the same, i.e., he or she is not taking part in the management of the debtor."). In the Debtor's corporate hierarchy, the titles of the KERP

---

5     The Chief Implementation Officer, Chief Pilot and Chief Human Resources Officers listed on the Schedule of KERP Participants attached to the Declaration and copied above are not insiders of the Debtor. These officers, like the other KERP Participants, must obtain approval from senior personnel before taking any significant action with respect to the Debtor's corporate policies or the disposition of significant assets.

6     The restrictions contained in section 503(c)(2) of the Bankruptcy Code do not apply because the KERP Participants are not insiders, and because the KERP does not provide for any severance payments.

Participants convey no special privileges or corporate authority, and in each case, the KERP Participants' scope of authority and control is limited. Specifically, all KERP Participants report to a more senior-level employee, and no KERP Participant has the ultimate decision-making authority to dictate the Debtor's corporate policy or the disposition of corporate assets. Moreover, none of the KERP Participants were involved in negotiating the KERP terms and did not have the authority to modify any of the terms of the KERP. As a result, the KERP was negotiated at arm's length, and none of the KERP Participants were in a position to gain an unfair advantage as non-statutory insiders.

27. Accordingly, the Debtor respectfully submits that section 503(c)(1) of the Bankruptcy Code does not apply to the KERP. *See Global Aviation*, 478 B.R. at 148 (holding none of the proposed retention plan participants were insiders, notwithstanding job titles containing the phrases "director" and "vice president," where they did not attend board meetings, participate in corporate governance, or report to the board); *Borders*, 453 B.R. at 470 (holding none of the proposed retention plan participants were insiders notwithstanding formal titles, where "none of them ha[d] the authority to implement company policies").

II. **The court should authorize the KERP administrative priority treatment as actual and necessary costs of preserving Debtor's estate pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.**

28. The payments contemplated under the KERP constitute actual and necessary expenses of preserving and enhancing the Debtor's estate. *See* 11 U.S.C. §§ 503(b), 507(a)(2). The Debtor's ability to maximize recoveries for its estate and for all creditors and parties in interest is dependent upon the KERP Participants' remaining with the Debtor throughout the period of time during the pendency of the chapter 11 case that their positions are deemed by the

Debtor to be required. Absent payments pursuant to the KERP, the value of the estate will be substantially diminished.

### THE REQUIREMENTS OF BANKRUPTCY RULES 6003 ARE SATISFIED

29. Bankruptcy Rule 6003 empowers the Court to issue an order, within 21 days after the Petition Date, granting a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" if such requested relief is "necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b). For the reasons discussed above, immediate and irreparable harm would result if the relief requested herein were not granted. Failing to provide additional compensation to certain key employees will sorely impede the Debtor's ability to conduct an orderly liquidation of its assets. Moreover, if the Debtor cannot provide assurances on an interim basis, then there is a significant risk that the relief sought in this KERP Motion will become moot. Accordingly, the Debtor submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### WAIVER OF BANKRUPTCY RULE 6004(h)

30. The Debtor also requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief requested in this Motion is necessary for the Debtor to preserve the value of its estate. Accordingly, the Debtor respectfully requests that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**NOTICE**

31. The Debtor has provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) each of the Debtor's creditors holding the twenty (20) largest unsecured claims as set forth in the list filed with the Debtor's petition; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Attorney's Office for the District of Delaware; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested in this Motion, the Debtor respectfully submits that no further notice is necessary.

Dated: August 23, 2022
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Eric D. Schwartz*
Eric D. Schwartz (No. 3134)
Matthew B. Harvey (No. 5186)
Paige N. Topper (No. 6470)
Jonathan M. Weyand (No. 6959)
Sophie Rogers Churchill (No. 6905)
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
eschwartz@morrisnichols.com
mharvey@morrisnichols.com
ptopper@morrisnichols.com
jweyand@morrisnichols.com
srchurchill@morrisnichols.com

*Proposed Counsel to the Debtor and Debtor in Possession*