## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| **EXPRESSJET AIRLINES LLC,** | Case No. 22-10787 (MFW) |
| Debtor.[1] | **Re: D.I. 11, 12** |

### DECLARATION OF JOHN GREENLEE IN SUPPORT OF DEBTOR'S MOTIONS FOR ENTRY OF (A) INTERIM AND FINAL ORDERS (I) APPROVING DEBTOR'S KEY EMPLOYEE RETENTION PROGRAM (II) GRANTING ADMINISTRATIVE EXPENSE PRIORITY STATUS TO ALL PAYMENTS TO BE MADE BY THE DEBTOR PURSUANT THERETO AND (III) GRANTING RELATED RELIEF, AND (B) SHORTENING TIME FOR NOTICE THEREOF

I, John Greenlee, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.    I am the President of ExpressJet Airlines LLC, the above-captioned debtor and debtor-in-possession (the "Debtor"). I have been with the company since February 2019 in different capacities, I am familiar with the Debtor's human resources, and I have gathered the information for this declaration in the course of fulfilling my position with the Debtor.

2.    I submit this declaration (the "Declaration") in support of the *Debtor's Motion for Entry of Interim and Final Orders (I) Approving Debtor's Key Employee Retention Program (II) Granting Administrative Expense Priority Status to All Payments to be Made by the Debtor Pursuant thereto and (III) Granting Related Relief* (D.I. 11) (the "Motion") and *the Debtor's Motion to Shorten Notice of Debtor's Motion for Entry of Interim and Final Orders (I) Approving*

---

[1]    The last four digits of the Debtor's federal EIN are 4495. The Debtor's mailing address is 1745 Phoenix Boulevard, Suite 250, College Park, GA 30349.

*Debtor's Key Employee Retention Program (II) Granting Administrative Expense Priority Status to All Payments to be Made by the Debtor Pursuant thereto and (III) Granting Related Relief* (D.I. 12) (the "Motion to Shorten"), to provide information to the Court and parties in interest regarding the Key Employee Retention Program designed by the Debtor, for which the Motion seeks authority to implement. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtor's management or the Debtor's professionals, discussions with other employees of the Debtor, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and human resources required by the Debtor for an orderly wind down of those operations and to preserve the value of, and liquidate, the Debtor's assets. If called as a witness, I could and would competently testify to the matters set forth in this Declaration.

3.        On April 23, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") thereby commencing this chapter 11 case (the "Chapter 11 Case"), as well as certain motions and other applications (the "First-Day Motions") with the Court. The Motion was filed on the Petition Date, along with those First Day Motions.

4.        In addition to the First Day Motions, the Debtor is concurrently filing the Motion, and the Motion to Shorten.  I submit this Declaration in support of the Motion and the Motion to Shorten, because both are critical to the Debtor's ability to provide assurance to those employees it needs to retain. Unless the time for notice of the Motion can be shortened to accommodate the short-term nature of the Debtor's post-petition employment of certain of these individuals, the

Debtor will not be able to obtain the relief it needs in time to retain and compensate these highly marketable employees.

5.      The targeted, marketable employees have been included in the KERP because their services are critical to the preservation of the Debtor's Physical Assets (as defined and described by the First Day Declaration). If the Motion is not heard at the beginning of this Chapter 11 Case, then the employees may leave before the Debtor has an opportunity to present the Motion and seek approval of the relief therein. As noted in the KERP Declaration, employment opportunities exist for these individuals across the tarmac from the location of their current employment with the Debtor. Therefore, it is essential that the Motion be heard in time to effectively retain these employees.

6.      The Debtor cannot afford to lose the employees who are necessary to maintaining and preserving the Debtor's Physical Assets for sale and to liquidate in chapter 11. Therefore, quickly implementing its KERP is essential, and the Debtor has requested that the time for notice of the Motion be shortened. Without approval of the Debtor's proposed KERP, there is a very real concern that key employees will resign.

7.      The Debtor has historically been engaged in business as a "regional air carrier," providing flight services on behalf of other airlines under private label capacity purchase agreements using aircraft subleased from United.

8.      As I stated in the *Declaration of John Greenlee in Support of Chapter 11 Petition and First Day Relief* (the "First Day Declaration"), the Debtor's primary objectives for this Chapter 11 Case are to sell the Physical Assets and then pursue a plan of liquidation.

9.      To conserve resources, the Debtor is winding down its operations, including its human resources, in an orderly fashion while at the same time endeavoring to preserve its saleable Physical Assets, as described in more detail in the First Day Declaration.

10.     In order to maximize the value of the estate for the benefit of the Debtor's creditors and fulfill the Debtor's obligations with respect to the asset sales, liquidation and the winding down of the Debtor's business, it is critical that core staff of the Debtor's employees remain in place.  Each KERP Participant is a member of that core staff who performs a function that will maximize the value of this estate, whether by fulfillment of the Debtor's obligations as debtor-in-possession winding down its estate, or by performing a function that is critical to the preservation of the Debtor's saleable assets.

11.     Facing this reality, the Debtor and its professionals analyzed what steps could be taken to ensure that the KERP Participants would be willing to remain employed by the Debtor rather than seeking alternative employment.  Based on this analysis, the Debtor formulated the KERP proposed by the Motion, which the Debtor has determined provides additional compensation necessary to ensure the retention of the KERP Participants, but far less than contracting with a third party to perform the Debtor's ongoing purchase agreement and other obligations.

12.     The Debtor believes that the KERP is integral to achieving an efficient wind down process that will preserve and maximize the value of the Debtor's estate, and that the KERP is, therefore, necessary to maximize distributions to the Debtor's unsecured creditors.

13.     The KERP Participants consist of approximately thirty-five employees of the Debtor who are essential to supervising and administering the orderly wind down of operations of the Debtor and preserving the Debtor's Physical Assets.  The KERP Participants work across a

variety of departments, but generally fall into the following categories: (a) accounting; (b) operations; (c) human resources; (d) information technology; (e) mechanical services, and (f) pilots.  Each KERP Participant possesses institutional knowledge and skills that are essential to the Debtor's wind down efforts.  The loss of the KERP Participants at this time would seriously jeopardize the Debtor's ability to orderly and efficiently wind down its operations, and could negatively impact recovery to creditors by risking loss of the value of the Debtor's Physical Assets, which the Debtor intends to sell for the benefit of its creditors.

14.     Each KERP Participant reports to a more senior manager and must obtain approval from an appropriate senior manager before taking any significant action with respect to the Debtor's corporate policies or the disposition of significant assets.

A.     **The Proposed Terms of the KERP**

15.     The Debtor designed the KERP to incentivize valuable, non-senior management personnel to remain employed with the Debtor during the Chapter 11 Case, and to avoid the costs and disruption associated with attrition and turnover.[2]  The Debtor carefully and diligently crafted the KERP in close consultation with its advisors.  In doing so, the Debtor identified the KERP Participants as approximately thirty-five key, non-insider employees whose continued employment is crucial to the Debtor's ability to wind down in an organized manner and preserve its assets during the period of uncertainty associated with the Debtor's liquidation.

16.     The goal of the KERP is to reduce the risk of loss of key employees necessary to complete the work required for the wind down of the Debtor's operations.  To do this, a higher percentage of retention compensation is allocated to those KERP Participants whose employment

---

[2]     The Debtor saw the need to retain the KERP Participants as particularly significant given the Debtor's expressly stated intention to liquidate, and all of the KERP Participants' positions will ultimately be eliminated during the course of this Chapter 11 Case.

is essential to the more tactical and imperative tasks that must be accomplished. The KERP aims (a) to retain employees for 1-4 weeks to ensure an orderly wind down with the maximum extraction and preservation of company assets, and (b) after that, to retain a small group of employees to assist in the preservation and sale of valuable aircraft parts and for other Chapter 11 tasks.

17.     In sum, given the two goals (orderly wind down and safeguard/sale of aircraft parts) the KERP has been designed to provide the highest KERP amounts to employees who are the most critical to the estate and who are most likely to leave the Debtor's employ for other employment.

18.     Under the terms of the KERP, each KERP Participant will be entitled to his or her full compensation plus an additional payment equal to the percentage of monthly base compensation indicated in the chart below (which is also attached as Exhibit A to the Declaration) for each month the KERP Participant remains employed by the Debtor (and pro-rated to the portion of a month that such KERP Participant remains so employed), provided that the KERP Participant remains with the Debtor through his/her scheduled termination date, as determined by the Debtor.

B.      **The KERP Meets the Debtor's Goals and Needs in this Chapter 11 Case**

1.  *The KERP Design Includes High-Flight-Risk and High-Immediate-Need Groupings*

19.     Given the debtor's primary two goals, to conduct an orderly wind down and to safeguard and sell valuable aircraft parts, the KERP has been designed to provide the highest KERP amounts to employees who are the most critical to the estate and who pose the highest flight risk.

- Employees who are recommended for the 200% KERP monthly compensation are either:

  o   Those needed for a short 1-3 week period for the wind down, to ensure that facilities are exited without claims and parts are shipped to the warehouse without losing value,

      or

- o Those materials and parts specialists required to catalog, maintain, and audit parts and assist in the inspection and sale process.

- o Following the completion of the first 3 weeks, all six remaining employees with 200% KERP are those in the materials department.  The company facilities are at major airports with airlines in very significant hiring mode, under directives from the DOT Secretary to staff up to reduce operational issues.  Therefore, the seemingly generous KERP is designed to temporarily provide the incentives for these employees to stay.  Even with that, the Debtor's expectation is to be successful only in retaining approximately 50% of those employees.

- Employees with 150% KERP awards are similarly those with transferrable skills and in functions that can be done remotely, thereby increasing their ability to find alternative employment quickly, or are in high-demand I.T. functions.  Specifically:

- o The 150% KERP group contains I.T. and supervisory-level materials employees (i.e., those that are required to consolidate the company's intangible property such as operating manuals, records, etc.);

- o This level of KERP compensation is necessary to retain the employees that ensure the value of the estate, and payroll and benefits functions that are critical to ensure immediate compliance with applicable state laws.

- Employees with lower KERP levels are typically Managers and others where the Company has a reasonable expectation of their continued employment for the term.

   **2.   *The KERP Design Ensures Retention of Employees.***

   20.     The KERP is designed to pay a higher percentage to those employees who are able to quickly secure alternate employment—typically those with trade skills (e.g. materials specialist/stock clerk)—who are typically in lower pay grades and subject to today's employee friendly market with all airlines hiring in vast numbers.

| Monthly Base Salary | KERP as a % of Base |
|---|---|
| $0 - $5,000 per month | 200% |
| $5,001 - $7,500 per month | 150% |
| $7,501 – $10,000 per month | 100% |
| $10,001 - $25,000 per month | 50% |

### 3. *KERP Eligibility is Premised on Duration of Employment with Debtor.*

21.     KERP payments will begin for employees on the Petition Date through the duration of their employment.  While the below table is subject to change based on the expected completion of tasks and work activity, the expectation is that there will be fewer than 20 employees on the KERP program for 3 weeks beyond the filing date.

| Employee Departure Date | Employee Count | Percentage of Employees | Eligible for KERP? |
|---|---|---|---|
| Temporary & No-KERP | 15 | 11% | No |
| Day of Filing | 71 | 58% | No |
| 3 Days After Filing | 9 | 6% | No |
| 7 Days After Filing | 11 | 8% | Yes |
| 21 Days After Filing | 10 | 7% | Yes |
| *Beyond 21 days* | *15* | *10%* | *Yes* |

### 3. *KERP Participant Functions by Department and Expected Duration.*

22.     Thirty-five (35) employees will be offered KERP and twenty (20) of these employees will be in place to perform short-term wind down tasks (exiting airport locations, securing airline operating manuals and electronic data, etc.).  The remaining fifteen (15) will be in place to perform tasks related to the preservation and ultimate sale of aircraft parts.  Approximately three-quarters of those 15 are in high-flight-risk jobs, and the expectation is that about half of those offered the KERP will accept and remain.

### 4. *The Debtor has Concluded that the KERP is Needed for Success in this Case.*

23.     The Debtor requires the specific knowledge and skill sets of these key, non-insider employees to maintain certain functions while in wind down mode so that the value of its assets can be maximized through the consummation of the sale of its assets and the ongoing liquidation. The KERP Participants are highly skilled in their particular fields and are intimately familiar with

the Debtor's requirements at this juncture in the Debtor's progression toward liquidation. These KERP Participants have skills that are unique and difficult to replace and that also make many of them highly marketable to other employers.

24.     The Debtor's ability to retain the services of the KERP Participants is jeopardized by the very nature of the wind down of its business, which eliminates the long-term prospect of employment for the KERP Participants.  The success of the wind down process and this Chapter 11 Case will depend in large part on the skills and institutional knowledge of each KERP Participant and his or her willingness to work with the same level of diligence as performed to date, notwithstanding that (a) the vast majority of the Debtor's employees will be or have been terminated as the closings of the operations and locations conclude and (b) the KERP Participants' own employment with the Debtor will be terminated once the wind down and/or liquidation processes conclude.  Due to the reduction in the Debtor's workforce, the Debtor's KERP Participants have been, and will be, called upon to take on significant responsibilities in addition to their normal day-to-day functions in order to effectuate a successful wind down.  Absent the relief requested herein, the KERP Participants would likely, and understandably, begin to search for alternative employment opportunities promising long-term stability.  Such an outcome would be devastating to the Debtor, which would be placed in the difficult situation of trying to attract replacements with only the promise of short-term employment.

25.     Further, the benefits of the KERP to the estate far outweigh its costs.  Assuming that no KERP beneficiary leaves before the Debtor asks them to leave, which is unlikely, the overall cost of the KERP, would be approximately $450,000, which is reasonable in light of the size of the Debtor's estate, value of the assets to be preserved for sale, the high degree of loss of

that value if the KERP Participants ceased to be in the Debtor's employ, and the costs and foregone benefits that would be associated with the loss of this particular workforce.

26.    Finally, the KERP will improve employee morale overall and incentivize employees to remain with the Debtor.  The adoption of the KERP will assure each KERP Participant that his or her efforts during the wind down process are valued by the Debtor and its creditors, and will be rewarded accordingly.  Moreover, approval of the KERP will provide the KERP Participants with a greater sense of financial security, thereby eliminating a potential distraction that could adversely affect performance.  As a result, the KERP will help to ensure that the KERP Participants remain dedicated and committed to the success of the wind down process.

I certify under penalty of perjury that, based upon my knowledge, information and belief, as set forth in this Declaration, the foregoing is true and correct.

Executed: August 23, 2022

*/s/ John Greenlee*
John Greenlee
President
ExpressJet Airlines LLC
